**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RONALD G. TURNER,**

**Plaintiff,**

*- against -*

**ROBERT L. WILKIE, Secretary, United States**
**Department of Veteran Affairs,**

**Defendant.**

**18cv4038 (LMS)**

**DECISION AND ORDER**

**LISA MARGARET SMITH, U.S.M.J.** [1]

Plaintiff Ronald G. Turner ("Plaintiff") brings this action against Defendant Robert L.

Wilkie, Secretary of the United States Department of Veteran Affairs ("Defendant"), asserting

claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State

Human Rights Law ("NYSHRL") for discrimination based on race.  Amended Complaint ("Am.

Compl."), Docket No. 18.  Currently before the Court is Defendant's motion for summary

judgment.  Mot. Summ. J., Docket No. 51.  For the following reasons, Defendant's motion is

**GRANTED in part and DENIED in part**.

---

[1] The parties have consented to the undersigned's exercise of jurisdiction over this matter
pursuant to 28 U.S.C. § 636(c).  Consent Order, Docket No. 27.

I.      BACKGROUND

*The Facts*

"The following facts are either undisputed or described in the light most favorable to the

Plaintiff, the non-moving party."[2]  Castro v. Target Corp., No. 14 Civ. 526 (WFK) (LB), 2015

WL 1476863, *1 (E.D.N.Y. Mar. 31, 2015)[3] (citing Capobianco v. City of New York, 422 F.3d

47, 50 n.1 (2d Cir. 2005)).

Plaintiff is an African American Recreational Therapist working for the Department of

Veterans Affairs ("VA"), Hudson Valley Healthcare System ("VA Hudson Valley") located in

Montrose, New York.   Def.'s 56.1 ¶ 1.  According to Veterans Health Administration ("VHA")

Directive 1172.05:

> Recreation therapy is a health care discipline that provides services to
> restore, remediate, and/or rehabilitate functional capabilities for Veterans with
> injuries, chronic illnesses, and disabling conditions.  Recreation and creative
> arts therapists provide treatment services to Veterans, their families and
> caregivers in two major areas: therapy interventions that result in positive
> functional outcomes, and meaningful activities that lead to Veterans' experience
> and sense of well-being.

VHA Directive 1172.05 at 1.[4]  Plaintiff has been a VA employee since January 2005.

Def.'s 56.1 ¶ 2.

---

[2] The facts are taken from Defendant's Local Civil Rule 56.1 Statement ("Def.'s 56.1") at Docket
No. 57, Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. Response") at Docket No.
63, Pl.'s Additional Material Facts ("Pl.'s Material Facts") also at Docket No. 63, Plaintiff's
Declaration in Opposition to Defendant's Motion for Summary Judgement ("Pl.'s Decl.") at
Docket No. 64, Plaintiff's Memorandum of Law in Opposition ("Pl.'s Memo.') at Docket No. 65,
and exhibits submitted by Defendant in connection with this motion.

[3] Copies of all unpublished decisions contained herein will be sent to pro se Plaintiff, along with
a copy of this Decision and Order.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

[4] The Court takes judicial notice of the contents of VHA Directive 1172.05, cited in Defendant's
Rule 56.1 Statement at ¶ 4.  The directive is available at
https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=4327.

In October 2013, the VA issued a job announcement for two open "Supervisory Recreation Therapist" ("RTS") positions at VA Hudson Valley.  Def.'s 56.1 ¶ 6.  The single job announcement covered one RTS opening in the long-term care division and one opening in the mental health division.  See Ex. 13[5] at G260 (displaying alternate first interview questions depending on whether a candidate applied for the "Mental Health Supervisory Position" or the "Long Term Care Supervisory Position.").  The basic requirement for each position was the same: a degree in recreation therapy, a creative arts therapy field, or "major in an appropriate subject-matter field with therapeutic emphasis or concentration."  Ex. 6 at G194-95.  Applicants were additionally required to have certain specialized experience which could include "highly specialized therapeutic recreation treatment approaches to accomplish complex treatment objectives, performing complex evaluations and tests, devising or adapting equipment to carry out treatment with severely physically disabled and/or mentally disabled patients."  Id. at G194.  There were also time-in-grade and physical requirements associated with the RTS positions.  Id.  The duties and responsibilities of an RTS include: program planning and coordination, supervising the activities of professional staff, developing and implementing processes and interventions to enhance patient care in a range of rehabilitative therapies, participating in public relations and community affairs, assisting with volunteers, remaining up-to-date on VA policies and procedures, and representing the Recreation Therapy section on administrative committees.  Ex. 8 at G216-17; Def.'s 56.1 ¶¶ 7-10.  The job announcement indicated that applicants would be

---

[5] Defendant filed thirty-nine exhibits in support of its motion.  Exhibits 1 through 35 are attached to counsel's declaration at Docket No. 56 and Exhibits 36 through 39 are attached to counsel's reply declaration at Docket No. 71.  The exhibits are identified with Bates numbers beginning with the letter "G" and will be so identified here.  Plaintiff has not filed any exhibits to be considered in opposition to Defendant's motion.

rated on specific Knowledge, Skills, Abilities and Other characteristics ("KSAs"): the ability to supervise; the ability to accomplish work through others; the ability to analyze organizational and operational problems and develop solutions; professional knowledge of the principles, concepts and techniques of the specialized therapy field; and, the ability to communicate orally and in writing in performing supervisory or leader work.  Def.'s 56.1 at ¶ 14.[6]  Plaintiff submitted an application to the VA posting with the intention of pursuing the mental health RTS position.  Ex. 9; Ex. 13.

The VA Hudson Valley Human Resources Department ("HR") used Merit Promotion Program procedures to generate a list of the best qualified applicants for the RTS positions.  Def.'s 56.1 ¶¶ 16-18; Ex. 10 at 1.  The best qualified candidates were Lane Chazdon ("Chazdon"), Peter Dinoff ("Dinoff"), Pedro Gonzalez ("Gonzalez"), Amy Hahn ("Hahn"), Charles Leitch ("Leitch"), Melissa Mazzio ("Mazzio"), and Plaintiff.  Def.'s 56.1 ¶ 19[7].  Plaintiff was the only African American applicant.  Pl.'s Memo. at 3.  HR then transmitted this list (along with the candidates' resume, performance appraisals, and work awards) to the selecting officer, Julia Anderson ("Anderson"), the Chief of Recreation Therapy Services at VA Hudson Valley and Plaintiff's supervisor.  Def.'s 56.1 ¶¶ 18, 3; Ex. 1 at G109.  As the selecting officer, Anderson had the option of either selecting a candidate based solely on the files she received from human

---

[6] Plaintiff disputes this fact arguing that the record lacks the KSA ratings for the other candidates selected to interview to compare with Plaintiff's KSAs.  See Pl.'s Response at ¶ 14.  Plaintiff does not appear to dispute the fact that candidates were evaluated for the position using KSAs, at least at the application stage.

[7] Plaintiff disputes this fact on the grounds that the ultimate selectee, Pedro Gonzalez, indicated to Plaintiff that Gonzalez received preferential treatment.  Pl.'s Response at ¶ 19.  Plaintiff's allegation is not contrary to the fact asserted in Defendant's 56.1 Statement, but it is included here for the sake of completeness.

resources or by interviewing all the candidates.  Def.'s 56.1 ¶ 20; Ex. 5 at G171.[8]  Anderson

chose to proceed with interviews.  Def's 56.1 ¶ 21.[9]

      The qualified candidates faced two rounds of interviews.  Id.  Anderson solicited sample

questions from her peers at other VA locations.  Id.; Ex.28, Ex. 29.  Anderson used these

samples to create the questions and score sheets for the first-round interview.  See Def.'s 56.1 at

¶ 23.  The first-round interview consisted of eight questions, which were to be scored on a scale

from one to five based on the detail of the response given and how fully it addressed the question

asked.[10]  Def.'s 56.1 ¶¶ 24-25.  The interview questions asked candidates to describe their

experience in the field, respond to a hypothetical, address what they know about the position,

among other things.  See Ex. 13.  The questions were listed on score sheets along with space to

the right of each question for notes, a space to mark the score for each question, and a

restatement of the scoring rubric.  Def.'s 56.1 at ¶ 24; see Ex. 13.  Anderson did not participate in

the first-round interviews and selected Patricia Cole ("Cole"), Recreation Therapy Assistant

---

[8] Plaintiff disputes this fact on the ground that Anderson testified at her deposition that Plaintiff would be the only candidate who would be affected by her decision to not give Plaintiff credit for having two master's degrees.  Pl.'s Response at ¶ 20.  Plaintiff's allegation is not contrary to the fact asserted in Defendant's 56.1 Statement, but it is included here for the sake of completeness.

[9] Plaintiff disputes this fact on the ground that, "[o]n the morning of the interview [,] [Patricia Cole] said she was reading the interview questions for the first time which contradicts that she assisted Julia Anderson in writing them."  Pl.'s Response at ¶ 21.  Plaintiff's allegation is not contrary to the fact asserted in Defendant's 56.1 Statement, but it is included here for the sake of completeness.

[10] The panelists were to award points for each question as follows: "1 [point].  Short or no answer;" "2 [points].  Had difficulty answering the question.  Gave a vague response;" "3 [points].  Gave a good general response but failed to provide specific examples or specific details;" "4 [points].  Provided specific details but did not address all aspects of the questions as fully as expected;" and "5 [points].  Provided a detailed, appropriate response fully addressing all aspects of the question."  Def.'s 56.1 ¶ 25.

Program Manager, Anne Bistline ("Bistline"), Program Manager for Nutrition and Food Service, and Lucille Donovan ("Donovan"), Quality Management Specialist, to be the first-round interview panelists.  Def.'s 56.1 ¶ 28.  Anderson, Cole, Bistline, and Donovan all identify as Caucasian.  Ex. 1 at G110; Ex. 4 at G148; Ex. 3 at G136; Ex. 2 at G120.

Anderson set the first-round interview dates for Wednesday, November 20, 2013, and Friday, November 22, 2013, and created the schedule of interviews.  Def.'s 56.1 ¶¶ 30-36.  The interview schedule accounted for the work schedules of the candidates and the availability of the panelists.  Ex. 19 at G705, G707.  Plaintiff was initially scheduled to interview on Friday, November 22, 2013, at 10:00 a.m., which was Plaintiff's day off.  Def.'s 56.1 ¶¶ 31, 34.  Plaintiff would have been the penultimate candidate to interview.  Ex. 19 at G707.  Due to Donovan's unavailability for several of the proposed interview times, Anderson reconfigured the interview schedule.  Def.'s 56.1 ¶¶ 32, 33, 35, 36.  Under the new schedule, Plaintiff's interview would take place on Wednesday, November 20, 2013, at 8:15 a.m., and Plaintiff would be the first candidate to interview.  Ex. 19 at G706.

On Tuesday, November 19, 2013, at approximately 10:30 a.m., Anderson notified each candidate by email of the date and time of their interview.  Def.'s 56.1 ¶ 38.  The first two candidates to be interviewed the following day, Plaintiff at 8:15 a.m. and Hahn at 9:00 a.m., received less than twenty-four-hours' notice of their interview; the final candidate to be interviewed that day, Leitch, received just over twenty-four-hours' notice.  Def.'s 56.1 ¶ 39; Ex. 18, Ex. 32.

Plaintiff arrived several minutes early to his 8:15 a.m. interview.  Pl.'s Material Facts at ¶ 2.  One interviewer, Donovan, was at the interview location when Plaintiff arrived.  Ex. 2 at G126-27.  According to Plaintiff, the other two interviewers were as much as fifteen minutes

6

late[11] for his interview; Defendant contends that the interviewers[12] were five to ten minutes late. Def.'s 56.1 ¶ 44.  Plaintiff alleges that he was rushed during his interview.  Pl's Response ¶ 54. According to Plaintiff, the panelists acted rudely to him during his interview and kept looking at their watches, which indicated to Plaintiff that his interviewers wanted him to give shorter answers and that if he complained that would have lowered his score.  Pl.'s Response ¶¶ 46, 49, 61-63.  Plaintiff alleges that his interview was significantly shorter than that of the other candidates.  Pl.'s Decl. ¶ 3.

> Bistline, Cole, and Donovan state in their declarations:
>
> 4.  The process I followed was the same during each interview.  I listened and took notes on the applicant's response to the interview questions.  I did not assign a score while the interview was taking place.  Once the interview ended and the applicant left the interview room, I reviewed my notes and assigned a score for each of the interviewee's responses before the next interview began.
>
> […]
>
> 6.  At no time did I discuss with the other panelists my evaluation of an applicant's answer or the score I was giving during the interviews or afterwards. Nor did I observe this happening between the other two panelists.

Bistline Decl., Docket No. 53 at ¶¶ 4, 6; Cole Decl., Docket No. 54 at ¶¶ 4, 6; Donovan Decl., Docket No. 55 at ¶¶ 4, 6.  Plaintiff disputes that the panelists did not discuss their evaluation or scores with each other on the grounds that there was no oversight and that the panelists did not

---

[11] Plaintiff gives varying statements about how long his interview was delayed, Pl.'s Response at ¶ 44 (20 minutes delay), but he asserts in his declaration in opposition to Defendant's motion (the contents of which have been affirmed under penalty of perjury) that the two interviewers were 15 minutes late.  Pl.'s Decl. at ¶ 3.

[12] Defendant's 56.1 Statement only refers to Bistline being late for Plaintiff's interview, citing Bistline and Cole's testimony collected during a subsequent EEOC investigation.  Def.'s 56.1 ¶ 44.  Defendant neglected to note that this fact is disputed by Donovan, who testified during the EEOC investigation that Bistline and Cole were late to Plaintiff's interview.  Ex. 2 at G126-27. Donovan did not mention an estimate of how late Bistline and Cole were for the interview.  Id.

mention this fact during the subsequent Equal Employment Opportunity Commission ("EEOC") investigation.  Pl.'s Decl. at ¶ 43.  The panelists describe keeping their score sheets until the last interview of the day was completed before giving them to Cole.  Bistline Decl. at ¶ 5; Cole Decl. at ¶ 5; Donovan Decl. at ¶ 5.  Cole noted that "After all of the applicants had been interviewed, I tallied the scores of each candidate and provided this score summary along with the panelists' completed interview score sheets to Julia Anderson."  Cole Decl. at ¶ 5.  The score summary Cole referred to is the HPDM Interview Summary Sheet ("summary sheet") which listed the name of the position being filled; the individual panelist's scores, total scores, and average scores for each candidate; an indication of the natural break in scores; three signature lines (which are blank); the date ("11/22/13"); and instructions on what to do once a selection is made, including returning the form to Human Resources.  Ex. 11.  The document stated that a natural break between the candidates occurred at 91 total points or 30 averaged points.  Id.  Four of the candidates scored above the natural break and two scored below it.  Id.  Plaintiff received an average score of 25.66 points, approximately four points below the break.  Ex. 11.  Gonzalez received 30.66 points, just above the break.  Id.  The top four scorers as listed on the summary sheet were invited back for another interview.  Def.'s 56.1 ¶ 52.  Plaintiff was not among those candidates invited back.  Plaintiff alleges that Gonzalez was given preferential treatment in that, among other things, Gonzalez was invited to the second-round interview without having finished his first-round interview.  Pl.'s Decl. at ¶ 4.

Second-round interviews took place on November 26, 2013, and November 27, 2013. Ex. 33.  Anderson and Cole were the only interviewers.  Def.'s 56.1 ¶ 57.  The candidates'

responses were scored by each interviewer.[13]  See Ex. 12.  For the second round, additional points were added to candidates' average scores for education: a Bachelor's degree was an additional 5 points, a Master's degrees was an additional 10 points, and a Doctorate was an additional 15 points.  Def.'s 56.1 ¶ 58; Ex. 12.  The highest scoring candidate from the second round was Gonzalez, a Hispanic male.  Def.'s 56.1 ¶ 59.  Gonzalez was chosen for the mental health position and Leitch[14] was chosen for the long-term care position.  See Ex. 31.  The chosen candidates were announced on December 9, 2013.  See Ex. 31.

Plaintiff began raising concerns about potential discrimination in the RTS hiring process on December 18, 2013.  Ex. 15, Ex. 16.  On February 26, 2014, Plaintiff filed a complaint before the EEOC against the VA for employment discrimination.  Ex. 23.  As a result, the VA investigated Plaintiff's claims and produced a "Report of Investigation" ("ROI").  Ex. 22 at G394.  Excerpts of the ROI are included as exhibits to Defendant's motion.  See Cowart Decl., Docket No. 56 ¶ 3.  The VA moved for summary judgment, which was granted for lack of evidence of pretext.  Id.  A Final Order was issued on September 9, 2016.  Id. at G402-04.  Plaintiff appealed the EEOC decision, which was denied on August 31, 2017.   Def.'s Memo. of Law, Docket No. 52 at 8[15]; Am. Compl. at 12.  Plaintiff moved for the EEOC to reconsider its decision on Plaintiff's appeal, which was denied on February 7, 2018.  Am. Compl. at 12.  Included in the

---

[13] The Court is unaware if the same scoring rubric was used for the candidates and was not provided any individual score sheets from the second round.  The second-round interview questions were included in Defendant's exhibits as Ex. 27.

[14] It does not appear from the documents in the record that Leitch participated in the second-round interview.  See Ex. 12; Ex. 33.

[15] The Court includes this date as it is stated in Defendant's recital of the procedural history.  However, the exhibit which Defendant cites does not appear to be the decision on Plaintiff's appeal of the EEOC decision, and it is dated September 9, 2016.  See Ex. 22 at G402-04.

EEOC's decision denying Plaintiff's motion for reconsideration was a paragraph titled "Complainant's Right to File a Civil Action," which gave Plaintiff 90 days from the date he received the decision to file an action in United States District Court.  Id.

Plaintiff commenced this action in federal court on May 4, 2018.  Complaint, Docket No. 1.  Plaintiff asserted an employment discrimination and retaliation claim under Title VII.  Id.  On October 15, 2018, the Court received Plaintiff's Amended Complaint, which added a claim under the NYSHRL.[16]  Docket No. 18.  Defendant answered each complaint.  See Answer, Docket Nos. 12 and 20.  Following the close of discovery, Defendant filed the instant motion for summary judgment.[17]  The matter was fully submitted on June 19, 2020.  See Docket Nos. 69-71.  On August 20, 2020, the Court notified Defendant that it would not consider certain documents submitted in support of its motion without proper authentication.  Order, Docket No. 75.  On August 25, 2020, Defendant filed the Declaration of Christopher P. Richins, a Staff Attorney for the Department of Veterans Affairs, who declared that he had personal knowledge of the documents attached in support of Defendant's motion because he maintained them in connection to his representation of the VA before the EEOC or requested them from the VA as part of discovery in this matter.  Richins Decl., Docket No. 76.

### *Plaintiff's Allegations*

Plaintiff essentially re-asserts the facts he pleaded in his amended complaint.  In brief, Plaintiff alleges that he was discriminated against during the interview process because (1) his

---

[16] Plaintiff's Amended Complaint does not specify whether the NYSHRL claim is for employment discrimination, retaliation, or both.  For purposes of ruling on Defendant's motion, the Court will consider Plaintiff to have raised identical claims under the NYSHRL as he raised under Title VII.

[17] Defendant's motion does not specifically address Plaintiff's NYSHRL claim(s) or Plaintiff's retaliation claim(s).

interview was cut short due to the tardiness of two of the interview panelists, (2) the interviewers behaved rudely toward him during his interview, (3) he was rushed during his interview, and (4) Gonzalez was treated more favorably than Plaintiff in part by being invited to the second-round interview without finishing his first.  See generally, Pl.'s Memo., Pl.'s Response, Pl.'s Decl.

Not addressed in Defendant's Rule 56.1 Statement are facts related to Plaintiff's claim of unlawful retaliation.  Plaintiff alleges that during 2011 Plaintiff was also employed part-time at the New York State Veterans Home ("NYSVH") in Montrose, New York, which share the same campus as the VA.  Pl's Decl. ¶ 7.  Plaintiff had filed an employment discrimination complaint against his supervisor at NYSVH, Ed Kloos, who allegedly had referred to himself as a "nigger lover."  Id.  Plaintiff claims that his supervisor threatened to tell Anderson that Plaintiff had falsely accused him of racial discrimination.  Id.  Plaintiff asserts upon information and belief that his NYSVH supervisor had followed through with his threat.  Id.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 320-23 (1986).

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

Local Civ. R. 56.1(a).  A dispute about a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson</u>, 477 U.S. at 250.  The inquiry to be performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact.  <u>Id.</u>

Under Local Rule 56.1(b), the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried. Local Civ. R. 56.1(b).  Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " <u>Berger v. United States</u>, 87 F.3d 60, 65 (2d Cir. 1996) (quoting <u>Celotex</u>, 477 U.S. at 323) (alteration in original).  If the party opposing summary judgment does not respond to the motion, the court may "grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

However, even where the nonmoving party fails to respond to a motion for summary judgment, the court

> may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented*.

D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)) (emphasis in original).  Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see also Anderson, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. v. Siemans Med. Sys. Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)).  "If reasonable minds could differ as to the import of the evidence," as we have previously explained, and [i]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted).

B.  Discrimination and Disparate Treatment under Title VII and the NYSHRL

Plaintiff claims that he suffered discrimination and disparate treatment based on his race in violation of Title VII and the NYSHRL.  "It is unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' "  Haughton v. Town of Cromwell, 735 F. App'x 27 (2d Cir. 2018) (summary order) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the

13

familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93

S.Ct. 1817, 36 L. Ed.2d 668 (1973), and its progeny." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78

(2d Cir. 2008).  "Claims brought under the NYSHRL are analyzed identically to those brought

under Title VII, and therefore the outcome of an employment discrimination claim made

pursuant to the NYSHRL is the same as it is under . . . Title VII." <u>Valerio v. City of New York</u>,

2020 WL 353749, *7 (S.D.N.Y. Jan. 21, 2020) (internal quotation marks omitted) (quoting <u>Hyek</u>

<u>v. Field Support Servs., Inc.</u>, 461 Fed. App'x. 59, 60 (2d Cir. 2012)).

"At the first stage of the <u>McDonnell Douglas</u> analysis, the plaintiff bears the burden of

establishing a <u>prima facie</u> case of discrimination by showing that: 1) he [or she] belonged to a

protected class; 2) he [or she] was qualified for the position; 3) he [or she] suffered an adverse

employment action; and 4) the adverse employment action occurred under circumstances giving

rise to an inference of discriminatory intent." <u>Id.</u> (internal quotation marks and citation omitted).

"The plaintiff's burden of proof at the <u>prima facie</u> stage is not onerous." <u>Id.</u> (internal quotation

marks and citation omitted).  "[O]nce a plaintiff has established a <u>prima facie</u> case, the burden

shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its

actions." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003).  "[O]nce the defendant has made

a showing of a neutral reason for the complained of action, to defeat summary judgment the

plaintiff's admissible evidence must show circumstances that would be sufficient to permit a

rational finder of fact to infer that the defendant's employment decision was more likely than not

based in whole or in part on discrimination." <u>Id.</u> (internal quotation marks, ellipsis, and citation

omitted).

In cases where the allegation is a discriminatory failure to promote,  Plaintiff must

demonstrate at step one that "(1) [he] is a member of a protected class; (2)[he] applied and was

14

qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."  Yu v. New York City Housing Development Corp., 494 Fed. App'x. 122, 124-25 (2d Cir. 2012) (alteration in original).  "[T]he fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff." Yu, 494 Fed. App'x. at 125 n.4 (quoting Stockwell v. City of Harvey, 597 F.3d 895, 901 (7th Cir.2010)).  Ultimately, Plaintiff must establish that "[he] 'was rejected under circumstances which give rise to an inference of unlawful discrimination.' "  Aulicino v. New York City Dept. of Homeless Services, 580 F.3d 73, 80 (2d Cir. 2009); see Lomotey v. Connecticut-Dept. of Transp., 355 Fed. App'x 478, 480 (2d Cir. 2009) (describing the inference of unlawful discrimination as the fourth element of a prima facie case of discriminatory failure to promote).

C.  Application of McDonnell Douglas Test

**Employment Discrimination under Title VII and NYSHRL**

It is undisputed that Plaintiff is a member of a protected class (African American), is qualified to perform the supervisory recreational therapist role (based on his resume, performance evaluation, and selection for an initial interview),[18] was rejected for the position, and that the employer filled the position with a candidate outside the protected class (the selected candidate, Gonzalez, is a Hispanic male[19]).  As will be discussed below, Plaintiff has raised a

---

[18] See Ex. 7 (Plaintiff's performance evaluation covering the period October 1, 2012, to September 30, 2013) and Ex. 9 (Plaintiff's application to the RTS position).

[19] Ex. 4 at G153.

genuine issue of fact as to whether the selected candidate (Gonzalez) was treated more favorably than Plaintiff.  Therefore, Plaintiff has established a prima facie case of discrimination.[20]

Defendant claims that Plaintiff was not selected for the supervisor position because Plaintiff did not answer the interview questions as well or with as much detail as other candidates, particularly as compared to Gonzalez, the candidate who was chosen for the position. Def.'s 56.1 ¶ 54.  Defendant supports this claim with, among other things, the ROI testimony of Cole, Bistline, and Donovan, who each stated during the EEOC investigation that Plaintiff's answers lacked detail, the panelists' score sheets for Plaintiff and Gonzalez, and the summary score sheet.  See Cowart Decl., Docket No 56; Def.'s 56.1 ¶¶ 61-63.  Anderson and the panelists deny that race played a role in who was chosen for the RTS position.  See Ex. 1, Ex. 2, Ex. 3, Ex. 4.  Defendant has satisfied its burden to articulate a legitimate, non-discriminatory reason for not selecting Plaintiff.

At step three of the McDonnell-Douglas test, Plaintiff must point to admissible evidence that would allow a rational factfinder to infer that Defendant's explanation is pretext for racial discrimination.  Kaur v. New York City Health & Hosps. Corp., 688 F. Supp. 2d 317, 331 (S.D.N.Y. 2010).  Because of Plaintiff's pro se status, the Court is required to liberally construe Plaintiff's submissions to raise the strongest arguments it suggests.  McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999).  Additionally, the Court may make its own review of the record and consider all Plaintiff's allegations for which there is support in the record.  Cf. Crum v. Dodrill,

---

[20] The case law in this Circuit makes clear that the Court may also presume that Plaintiff has established a prima facie case and proceed to step three in the McDonnell Douglas burden-shifting framework where Defendant has asserted a legitimate, non-discriminatory reason for the allegedly unlawful action.  See Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009).

562 F. Supp. 2d 366, 376, n.29 (N.D.N.Y. 2008) ("In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory. (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)") (collecting cases where summary judgment was denied because plaintiff's allegations were unsupported by the record); Perez v. de la Cruz, No. 09 CIV. 264 (JPO), 2013 WL 2641432, *8 n.6 (S.D.N.Y. June 12, 2013) ("In addition, for *pro se* plaintiffs, courts have relied for summary-judgment motions on papers that did not constitute affidavits or declarations."). Regardless of Plaintiff's pro se status, the Court is required to view the evidence in the light most favorable to Plaintiff and to draw all reasonable inferences that are supported by the record in his favor. With these parameters in mind, the Court considers Plaintiff's arguments and the exhibits and declarations filed by Defendant.

Plaintiff does not dispute that his interview answers may have lacked specificity. Pl.'s Response ¶ 54. Instead, Plaintiff argues that his interview was "procedurally sabotaged" to undermine his performance and that this was done with a racist motive to prevent him from being selected for the RTS position. Pl.'s Memo. at 2. The record shows genuine issues of fact regarding Defendant's non-discriminatory explanation and whether Gonzalez, the selected candidate, was treated more favorably than Plaintiff.

First, poor record-keeping by VA staff undermines Defendant's explanation that Plaintiff performed worse during his interview than other candidates based on Plaintiff's score sheets. Each panelist's score sheet for Plaintiff is dated November 21, 2013, but Plaintiff's interview took place on November 20, 2013. Ex. 13; Def.'s 56.1 ¶ 36. Cole's score sheet for Plaintiff lacks

any date or an identification of the interviewer on the last page.[21]  Ex. 13 at G264.  Defendant

does not address this discrepancy.  Donovan testified during the EEOC investigation that

Plaintiff interviewed on November 21, 2013, based upon this error.  Ex. 2 at G123.  The error is

neither acknowledged nor corrected in the record.  A reasonable jury may infer that the panelists

did not complete the score sheets on the day Plaintiff interviewed, which contradicts their

declarations.[22]  Bistline Decl., Docket No. 53 at ¶ 4; Cole Decl., Docket No. 54 at ¶ 4; Donovan

Decl., Docket No. 55 at ¶ 4.  The score sheets for Gonzalez contain more troubling date errors.

Gonzalez's first-round interview was scheduled for November 22, 2013, Ex. 17 at 2, with his

second-round interview to take place either November 26, 2013, or November 27, 2013.  Ex. 33.

Bistline's first-round score sheet for Gonzalez clearly identifies the date of the interview as

November 22, 2013, on the first page but November 27, 2013, on the last page.  Ex. 14 at G319,

G324.  Cole's first-round score sheet for Gonzalez looks as though someone changed "11/27/13"

to "11/22/13" on the first page and the last page clearly states "11/22/13."  Id. at G313, G318.  It

is harder to explain these errors as simply forgetting "today's date" since there is a five-day

difference between the dates.  A reasonable jury may infer that these score sheets were not

completed on November 22, 2013, the alleged date of Gonzalez's first-round interview; a jury

may also infer that this discrepancy lends credence to Plaintiff's contention that Gonzalez did not

---

[21] Plaintiff also points out that the one of the score sheets "looked like it was crossed out and
tampered with."  Pl. Memo. of Law in Opposition ("Pl. Memo."), Docket No. 65 at 5.  The Court
reviewed the score sheets which show indications of changes to the total scores on Cole's and
Bistline's score sheets.  Ex. 13 at G264, G270.  Cole's and Bistline's score sheets indicate that the
total score may have been altered to correct a calculation error, since none of the individual
question scores appear to have been changed.  No total scores on Gonzalez's score sheets were
rewritten or written over.  Ex. 14.

[22] The panelists may have also simply misdated the score sheets, but the Court is required to
draw reasonable inferences in the Plaintiff's favor.

finish his first interview before being invited for the second round.  Finally, the summary sheet

(which details the scores each candidate received, notes the average score, and indicates what

total and average scores would be used as cut-offs for the second-round interview) lacks

signatures for any panelist despite containing a space for each panelist to sign.  Ex. 11.[23]

Second, the panelists each submitted declarations stating that they scored the candidates

after each interview and that they did not discuss their scores with the other panelists.  Bistline

Decl. ¶ 6; Cole Decl. ¶ 6; Donovan Decl. ¶ 6. This evidence is undermined by references in the

record that suggest the candidates did confer with each other after each interview.  For example,

two days before the first interview, Anderson communicated by email to the panelists seeking

their approval on the proposed schedule of interviews.  Ex. 19.  Donovan indicated that she had a

scheduling conflict with two of the proposed time slots, which prompted Anderson to send out a

new proposed schedule.  Id.  In response to the new schedule, Donovan asked "Julie – so each

interview will be 45 minutes long?  Is that enough time to pose all the questions you are going to

provide and have a debrief after each interview?"  Ex. 19 at G705.  Anderson replied, "I will be

---

[23] Plaintiff's submission to the EEOC included a purported email chain wherein VA officials
attempted to locate Plaintiff's score sheets in response to Plaintiff's request.  Ex. 37, App's C at
14-16.  Allegedly, one VA Human Resources Specialist informed those copied in the email chain
that she had just spoken to Anderson and the score sheets were not submitted to Human
Resources.  Id. at 14 ("I just spoke to Julia, it was not sent to HR.").  Another Human Resources
Specialist indicated that he had received the interview summary sheet but did not mention having
access to the individual score sheets.  Id.  The Court has no declaration authenticating this email,
so it is inadmissible and will not be considered in determining this motion.  However,
presumably Defendant would be able to determine whether this email chain is among the VA's
emails related to this matter.  Assuming the emails are authenticated, the jury may take these
statements as additional evidence that undermines the reliability of the score sheets.

On December 4, 2013, Anderson sent the following email to VA officials: "If questions arise
concerning the Recreation Supervisor Interviews and scoring breakdowns I'm providing you with
the information via the attached spreadsheet.  The hardcopy documents are located in my office."
Ex. 26.  The attachment only provides summary score data for the second-round interviews.

shortening the question count so that there is ample time to complete each." Id.  During Cole's

ROI testimony, she stated "So, when we went over the questions, we rated them, and went

through them, because there was - - - I don't have the questions in front of me, but there were

several questions.  I'm going to maybe say eight to 10 questions, and we ranked them according

to the answers that the candidates gave us, and then we got the ranking of how all the candidates

scored, and then we based our selection on that."  Ex. 4 at G151.  These discrepancies call into

question the credibility of the panelists' testimony regarding how they conducted Plaintiff's

interview.

There is also a dispute about the length of Plaintiff's interview and whether Plaintiff

could have asked for more time, which raises the issue that Plaintiff may have had significantly

less time than the other candidates to answer the interview questions.  It is undisputed that

Plaintiff's interview started late.  Defendant contends that the interview was delayed by five to

ten minutes, Def.'s 56.1 ¶ 44, and Plaintiff contends that the interview was delayed by fifteen

minutes.[24]  There is no evidence that establishes with certainty how long Plaintiff's interview was

delayed.  Nevertheless, viewing the facts in the light most favorable to the non-moving party, a

ten to fifteen-minute delay in a forty-five-minute interview is enough time to be significant.  If

Plaintiff lost fifteen minutes from his interview time, then he would have been answering the

same eight questions as the other candidates but with one-third less time in which to do so.

Plaintiff also claims that he was rushed during his interview, that the panelists made gestures

(such as looking at their watches) that indicated to Plaintiff that he should answer quickly.  Pl's

Response ¶¶ 61-63.  The panelists deny that Plaintiff was rushed and assert that there was ample

---

[24] In his opposition papers Plaintiff states that the interviewers were fifteen minutes late and that
his interview was twenty minutes delayed.  See Pl.'s Decl. ¶ 2; Pl.'s Response ¶ 44.

time for Plaintiff to respond to all questions.  Ex. 2 at G127; Ex. 3 at G 138; Ex. 4 at G156,

G158-59.  However, the panelists gave unclear answers about how long Plaintiff's interview

lasted.  See Ex. 2 at G127; Ex. 4 at G159.  The Court is unpersuaded by Defendant's suggestion

that Plaintiff could have asked for more time if he felt rushed.  See Def.'s 56.1 ¶ 45.  If Plaintiff,

the only Black candidate, was given less time to interview than the other candidates, that

supports an inference that Plaintiff's race played at least some role in his non-selection.[25]  There

is no direct evidence on this point; the jury would have to determine whether to believe the

panelists' description of the interview timing or Plaintiff's.

      Finally, there is some indication in the record that Gonzalez was treated more favorably

than Plaintiff.  First, as mentioned above, there is a discrepancy in the dates on the panelists'

score sheets for Gonzalez's first interview.  Second, there is a difference in the panelist's spread

of scores for Gonzalez.  For every candidate, the maximum deviation from the other panelist's

scores was one point except for Gonzalez where the maximum deviation was two points.  In

Plaintiff's and Gonzalez's cases, Cole deviated from the scores of the other panelists.  Unlike the

other panelists, Cole had worked with Plaintiff and Gonzalez prior to the interviews.  Def.'s 56.1

¶ 29; see Pl.'s Additional Facts at ¶ 4.  In Plaintiff's case, Cole scored him one point lower than

the other panelists.  Ex. 13.  In Gonzalez's case, Cole scored him two points higher than the

other panelists.  Ex. 14.  Anderson acknowledged that Cole sent Anderson an email the day

before Gonzalez's first-round interview highlighting one of Gonzalez's achievements nearly a

---

[25] Defendant contends that if the candidates rushed Plaintiff in his interview to stay on schedule, this race neutral reason prevents an inference of discrimination.  Def.'s Reply, Docket No. 69 at 7.  However, if it is established that Plaintiff received less time and that the timing impacted his answers, it undermines Defendant's non-discriminatory explanation and bolsters a circumstantial case of discrimination.

year after the recognition had been awarded. Anderson Tr. 71:22-73:23.[26]  Plaintiff alleged

before the EEOC that two panelists' score sheets included notations on Gonzalez's score sheet

that he was professionally dressed for his interview. Ex. 37 at 8-9; Ex. 14 at G318 (Cole:

"Polished – suit professional"), G321 (Donovan: "Applicant professionally dressed in suit").

Plaintiff contends that he was also dressed in a suit for his interview, but no such notation was

made on his score sheets. Ex. 37 at 8-9.  A remark as to Gonzalez's professional appearance and

not Plaintiff's taken in addition to the other evidence can support an inference of discrimination

as a rational jury could infer that such a notation for Gonzalez and not for Plaintiff speaks to

implicit racial bias on the part of the interviewers.  Plaintiff also contends that Gonzalez is less

qualified than Plaintiff, but he offers no evidence to support this contention and the Court has

found no evidence in the record to support it.[27]  Pl.'s Material Facts at ¶ 2 (My interview was cut

short by the interviewing panel and I was not allotted the same amount of time as the other

candidates applying for the position.  Consequently, a less qualified, less discriminated against,

Puerto Rican male employee, Pedro Gonzalez, was selected instead of me").

    Plaintiff alleges that he had a conversation with Gonzalez on December 5, 2013, during

which Gonzalez allegedly stated that "he was invited back for a second interview without

finishing his first interview" and that Gonzalez was not asked at the start of his interview

---

[26] This citation refers to the transcript of Anderson's deposition conducted on December 4, 2019.
Excerpts of this transcript are attached to Defendant's papers at Ex. 35.  The Court subsequently
requested and received the full deposition transcript.  The Court did not request and has not
reviewed the exhibits used during that deposition.

[27] The Court has Plaintiff's application, resume, and performance evaluation, but it has no similar
records for Gonzalez with which to make a comparison.  The Court does have the first-round
interview score sheets for Plaintiff and Gonzalez, which show that Gonzalez received a higher
score.

whether he was applying for the mental health supervisor position or the long-term care supervisor position.  Pl.'s Decl. at ¶ 4.  Unfortunately, Gonzalez's alleged statements are hearsay not covered by an exception.  Hearsay refers to a statement that was made out of court and is being offered for the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  Hearsay statements are inadmissible pursuant to the Federal Rules of Evidence.  Fed. R. Evid. 802.  Plaintiff offers Gonzalez's out-of-court statements for the truth, e.g. to establish that Gonzalez really was invited to a second interview without finishing his first, which makes Gonzalez's statements hearsay.  No hearsay exception applies to these statements, so the Court cannot consider them.  See Fed. R. Evid. 803; Taylor v. Potter, No. 99 CIV. 4941(AJP), 2004 WL 1811423, *11 (S.D.N.Y. Aug. 16, 2004) (affirming that Plaintiff must present admissible evidence to defeat a motion for summary judgment).

Notwithstanding the inadmissibility of Gonzalez's statements in Plaintiff's declaration, the Court is concerned that Gonzalez's testimony may not have been taken in connection to Plaintiff's allegations, either during the EEOC investigation or during discovery in this case.[28] Considering that at least some evidence supporting an inference of preferential treatment for Gonzalez exists, see discussion supra, it strikes the Court as unusual that a deposition of Gonzalez was not conducted.  Moreover, Plaintiff raises a concerning allegation that Anderson, in preparation for a mediation that took place in January 2014, contacted Gonzalez on her own and obtained a denial from Gonzalez of having spoken with Plaintiff about the RTS position.  Ex. 37 at 10.

---

[28] Plaintiff asserts in his opposition that Gonzalez's testimony was not recorded in this case, and Defendant did not deny this in its reply.  Pl's Memo. at 1 ("Pedro Gonzalez's testimony was never taken under oath to determine if he had been treated differently than other candidates applying for the recreation therapy supervisor position . . .").

Plaintiff claims that Anderson intentionally disadvantaged Plaintiff by scheduling him as the first interview and giving him less than twenty-four hours to prepare.  Pl.'s Memo. at 2, 5: Pl.'s Response ¶ 39.  Plaintiff's claim about receiving less than twenty-four hours' notice of his interview does not support an inference of discrimination because the other candidates interviewed on the same day, who are outside the protected class, also received short notice: Hahn, scheduled for 9:00 a.m., received less than twenty-four hours' notice, and Leitch, scheduled for 11:00 a.m., received just over twenty-four hours' notice.  Ex. 32.  Plaintiff's claim that Anderson purposefully assigned him the first interview slot to disadvantage him has a slim connection to potential discrimination.  Anderson initially assigned Plaintiff to interview on Friday, November 22, 2013, at 10:00 a.m., during Plaintiff's day off, and only changed Plaintiff's interview date and time when Donovan stated that she would be unavailable for certain interview slots scheduled on Wednesday, November 20, 2013.  Ex. 19.  That Anderson scheduled Plaintiff to interview on his day off when the stated scheduling goal was to find dates and times when the candidates would be at work may have added to Plaintiff's argument that he was systematically disadvantaged, but Anderson rescheduled him to a date and time when he was already scheduled to be at work, dissipating most of the fact's probative value.

Plaintiff asserts that Anderson made racist comments in the workplace, implying that Anderson was racially biased against Plaintiff.  Pl.'s Decl. ¶ 6.  Plaintiff recounts one instance when, during the recreation staff's Christmas party in 2012, Plaintiff witnessed Anderson call an African American recreation therapy assistant "ghetto" when the assistant placed her "Secret Santa" gift ($15.00 worth of lottery cards) in her brassiere instead of surrendering the gift when she was required to do so by the rules of the game.  Id.  Plaintiff noted that, in an email to the Humans Resources Supervisor, Gary Poole, Anderson asked for guidance on drafting effective

RTS interview questions that would separate the best candidate from the "lower hanging fruit," which Plaintiff contends is historically associated with lynching. [29] Id.; Ex. 38.  Plaintiff also alleges that Anderson had a reputation for making racist comments that created a hostile work environment.  Pl's Memo. at 2-3.

Assuming arguendo that Anderson's comments are admissible,[30] they do not support a finding that racial discrimination played a role in Plaintiff's non-selection for the RTS position. The comments Anderson allegedly made at the 2012 Christmas party are too remote in time (taking place nearly a year before Plaintiff's interview) and removed from the hiring function to be considered.  See Costantin v. New York City Fire Dep't, No. 06 CIV. 04631(GBD)(THK), 2009 WL 3053851, *15 (S.D.N.Y. Sept. 22, 2009) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated

---

[29] The Court was unable to find a sufficiently reputable source to cite recounting the history or origin of the phrase "low hanging fruit," but it was unable to find any source linking the phrase's history to lynching.  It appears to have a benign origin.  However, the Court acknowledges that for African Americans and others who have experienced a history of lynching, the phrase can be particularly disturbing and offensive.  See "Strange Fruit," a poem written by Abel Meeropol and popularized by the performance of Billie Holliday that describes lynching through visceral metaphor; the phrase "low hanging fruit" can trigger African Americans and others to think of lynching in part due to the imagery of this popular song.  See Matthew Wills, The Unlikely Origins of "Strange Fruit", JSTOR Daily (July 21, 2016), https://daily.jstor.org/the-unlikely-origins-of-strange-fruit/.

[30]  Some of Anderson's comments may be admissible under Federal Rule of Evidence 801(d)(2)(D).  See Taylor v. Potter, No. 99 CIV. 4941(AJP), 2004 WL 1811423, *18 (S.D.N.Y. Aug. 16, 2004) ("This approach dovetails with the more general principle, recognized in the Second Circuit, that statements regarding employment matters are within the scope of the declarant's employment if the declarant was "an advisor or other significant participant in the decision-making process that is the subject matter of the statement.").  Under that rule, a statement is not hearsay if it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).

by discrimination. . . . The more a remark evinces a discriminatory state of mind, and the closer

the remark's relation to the allegedly discriminatory behavior, the more probative that remark

will be.") (quoting <u>Tomassi v. Insignia Fin. Grp., Inc.</u>, 478 F.3d 111 (2d Cir. 2007) <u>abrogated in</u>

<u>part on other grounds by</u> <u>Gross v. FBL Fin. Servs. Inc.</u>, 557 U.S. 167 (2009)).  Anderson's

"lower hanging fruit" comment was made just two days before Plaintiff's interview, Ex. 26, but

the phrase's popularity in corporate circles as a racially-neutral term renders the statement

insufficient on its own to lead to an inference of racial discrimination.  Moreover, Plaintiff has

not shown how the alleged racism on the part of Anderson infected his first-round interview,

which was conducted by Cole, Bistline, and Donovan.  Plaintiff does not offer evidence that

Anderson implicitly or explicitly instructed the panelists to disfavor Plaintiff or favor another

candidate in their scoring, nor does Plaintiff offer independent evidence of racial bias on the part

of the first-round panelists.[31]  Because Plaintiff can establish his discrimination claim through

circumstantial evidence, the lack of direct evidence of racial bias alone does not affect the

Court's determination at the summary judgment stage.  <u>See</u> <u>U.S. Postal Serv. Bd. of Governors v.</u>

<u>Aikens</u>, 460 U.S. 711, 714 n.3 (1983); <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d

1219 (2d Cir. 1994).

     Summary judgment must be granted only where the moving party has shown that there

are no genuine issues of material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a).  To be entitled to summary judgment, the evidence must be

such that no reasonable jury could find that more likely than not race played a role in Plaintiff's

---

[31] Plaintiff contends that Cole harbored racial bias against Plaintiff based on her and Anderson's
decision to replace Plaintiff as the coach for the VA Hudson Valley's National Wheelchair
Games with Gonzalez in 2009.  Pl's Material Facts ¶ 4.  This claim is unsupported by evidence in
the record, so it will not be considered.  The Court includes this for the sake of completeness.

non-selection for the RTS position based on the evidence presented.  Kaur, 688 F. Supp. 2d at

331.  When deciding a summary judgment motion in a discrimination case, the Court is

instructed to look at the evidence as a whole, and not in a piecemeal fashion, to determine

whether there is sufficient evidence to support an inference of discrimination.  See, e.g.,

Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) ("Rather, we hold that the Supreme

Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the

entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated against the plaintiff.'"); Rasmy v.

Marriott Int'l, Inc., 952 F.3d 379, 386 (2d Cir. 2020) ("In determining whether the moving party

is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the

opposing party's favor to create a genuine issue of material fact to be tried, the district court may

not properly consider the record in piecemeal fashion, trusting innocent explanations for

individual strands of evidence; rather, it must review all of the evidence in the record."); Atencio

v. United States Postal Serv., 198 F. Supp. 3d 340, 354 (S.D.N.Y. 2016) ("Because the employer

rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully

comb the available evidence in search of circumstantial proof to undercut the employer's

explanations for its actions.").  In this case there is no direct evidence of discrimination or racial

bias, but there is a set of circumstances from which one could infer that racial discrimination

played some role in the outcome.  The record contains sufficient information to create disputes of

fact from which a rational jury could infer that Defendant's explanation is pretext and from

which a rational jury could infer that Defendant treated Gonzalez more favorably that Plaintiff.

By undermining Defendant's race-neutral explanation and plausibly suggesting that preferential

treatment was given to someone outside Plaintiff's protected class, the evidence in the record is

sufficient to support an inference of unlawful discrimination.  Whether Plaintiff will convince a

jury that he was discriminated against because of his race is not for this Court to decide.  Gallo,

22 F.3d 1224 ("Finally, the trial court's task at the summary judgment motion stage of the

litigation is carefully limited to discerning whether there are any genuine issues of material fact

to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it

does not extend to issue-resolution.").

### Retaliation under Title VII and NYSHRL

Defendant does not specifically address Plaintiff's retaliation claim in its motion papers,

but it appears that Defendant intended to challenge all of Plaintiff's claims.  For that reason, the

Court will address Plaintiff's retaliation claim(s).

"Title VII's anti-retaliation provision makes it unlawful 'for an employer to discriminate

against any ... employee[ ] ... because [that employee] opposed any practice' made unlawful by

Title VII or 'made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter.' "  Hicks v. Baines, 593 F.3d 159, 161-162 (2d Cir.

2010).  A claim of unlawful retaliation under Title VII and the NYSHRL is analyzed using the

same McDonnell Douglas burden-shifting framework as discussed above.  Rojas v. Roman

Catholic Diocese of Rochester, 660 F.3d 98, 107-08 (2d Cir. 2011).  "To establish a prima facie

case of retaliation under Title VII and the NYSHRL, a plaintiff must establish by a

preponderance of the evidence: (1) participation in a protected activity; (2) the defendant's

knowledge of the protected activity; (3) a materially adverse employment action; and (4) a causal

connection between the protected activity and the adverse employment action."  Moore v.

Metropolitan Transp. Authority, 999 F. Supp.2d 482, 504 (S.D.N.Y. 2013) (citing Tepperwien v.

Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011)).  At the summary

judgment stage:

> The plaintiff's burden in this regard is *de minimis* and the court's role in evaluating
> a summary judgment request is to determine only whether proffered admissible
> evidence would be sufficient to permit a rational finder of fact to infer a
> retaliatory motive. If the plaintiff sustains this initial burden, a presumption of
> retaliation arises. The defendant must then articulate a legitimate, non-retaliatory
> reason for the adverse employment action. If so, the presumption of retaliation
> dissipates and the employee must show that retaliation was a substantial reason
> for the adverse employment action.

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011) (quoting Hicks

v. Baines, 593 F.3d 159, 164 (2d Cir.2010)).

Plaintiff alleges that in 2011 he filed a complaint of racial discrimination against his

supervisor, Ed Kloos.  Amd. Compl. at 10-11.  At the time, Plaintiff was working part-time as a

recreation therapist at NYSVH in addition to his full-time recreation therapist position at VA

Hudson Valley.  Id.  According to Plaintiff, the two employers shared the same campus.  Id.

Plaintiff alleges that in response to his complaint, "Mr. Kloos . . . told me that he would call Julia

Anderson (White female) my supervisor at the full time job and tell her that I had falsely accused

him of racial discrimination."  Id.  Plaintiff further alleges that Mr. Kloos made threats against

Plaintiff's life, was subsequently terminated, and that "[n]ews about the threat was widespread on

the campus as employees from both facilities approached me and said they had heard about it."

Id.  Plaintiff alleges that "upon information and belief . . . [Mr. Kloos] followed through with his

threat to call Julia Anderson (White female) about my complaints against him . . . Julia Anderson

(White female) heard people talk about Ed Kloos's threat against me on campus."  Id.

Even though Plaintiff's burden at step one of the McDonnell Douglas test is de minimis,

Plaintiff fails to reach the minimal threshold to establish a prima facie case of retaliation.  The

case law is clear that allegations made "upon information and belief" may not considered on a motion for summary judgment without evidence in the record supporting the contention.  Cf. SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 138 (2d Cir. 2009).  There is no evidence that Anderson was aware of Plaintiff's 2011 complaint, which must be shown to meet the second element of a retaliation claim.  Additionally, there is no evidence that the 2011 complaint was causally connected to the alleged retaliation (Plaintiff's non-selection for the RTS position).  The 2011 complaint is far in time from the 2013 interview with no evidence to suggest that the two events are connected.  Finally, there is no evidence that Anderson was involved in the first-round interview other than creating the questions and schedule or that any member of the first-round panel knew about Plaintiff's 2011 complaint.

### D.  Plaintiff's Request to Reopen Discovery Pursuant to FRCP 56(d) and 56(e)

In his opposition papers, Plaintiff requests that the Court deny Defendant's motion or in the alternative to withhold decision on the motion to allow Plaintiff to respond to deficiencies in his opposition pursuant to FRCP 56(e)(1) or that the Court grant Plaintiff an opportunity to conduct additional discovery pursuant to FRCP 56(d)(2).  Pl.'s Memo. at 2-3, 6.  Specifically, Plaintiff seeks additional time to "determine specific details regarding Pedro Gonzalez's interview procedure compared to the plaintiff's treatment during the interview" and for an investigation to "determine [Anderson's] degree of racial animus toward African Americans."  Id. at 6.  Plaintiff also notes that another employee, Angela Watford, would be willing to testify that Anderson called Watford "ghetto" at the office's 2012 Christmas party.  Id.  Defendant does not address Plaintiff's request in its reply.

Since this case is trial ready once this motion is decided, the Court is disinclined to reopen discovery.  Plaintiff has not submitted any reasons why details about Gonzalez's

interview and evidence of Anderson's racial animus were not sought during discovery (particularly of Craig Crawford, to whom Anderson allegedly made disparaging comments about Plaintiff in response to Crawford's question about the RTS selectee).[32]  However, Plaintiff has been proceeding <u>pro se</u> in this matter[33] and the motion is unopposed.  The Court will reserve decision on Plaintiff's request to reopen discovery to allow Defendant to present any opposition. Defendant's opposition must be filed and served within fourteen (14) days of the date of this order.  Any additional discovery, if granted, would be limited in scope and require prompt action to comply with a tight deadline.

## III.   CONCLUSION

Accordingly, the Court finds that Plaintiff has raised a genuine issue of material fact as to Defendant's discriminatory motive but had not established a <u>prima facie</u> case of retaliation. Based on the foregoing, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's retaliation claims **and DENIED** as to Plaintiff's discrimination claims.  Plaintiff is reminded that he may make a motion for <u>pro bono</u> counsel at any time that he deems appropriate.

---

[32] <u>See</u> Pl.'s Decl. ¶ 5.

[33] Plaintiff was represented by several pro bono attorneys for the limited purpose of defending his deposition and conducting two offensive depositions.  <u>See</u> Notice of Limited Appearance, Docket Nos. 31-33.

The Clerk of the Court is respectfully requested to terminate the motion at Docket No.

51.  A copy of this decision was emailed by chambers to pro se Plaintiff of record.


Dated: September 8, 2020
      White Plains, New York

                        **SO ORDERED**,

                        _____
                        Lisa Margaret Smith
                        United States Magistrate Judge
                        Southern District of New York